HOWARD D. JOHNSON COMPANY *vs.* ROBBINS LIGHT, INC.

Barnstable.   May 10, 1951. — November 5, 1951.

Present: QUA, C.J., LUMMUS, WILKINS, WILLIAMS, & COUNIHAN, JJ.

*Trade Name.   Contract*, Termination, Respecting trade name.

Further use by a defendant at a restaurant of a trade name and sign of the plaintiff was properly enjoined where it appeared that the defendant had been using them under an oral "arrangement" made between the plaintiff and the defendant's assignor, a woman, whereby she was to buy certain products for the restaurant exclusively from the plaintiff and was to operate it properly and the plaintiff was to allow her to use the name and sign there so long as she was not "hurting" the plaintiff "in any way," but that the establishment by the plaintiff of another restaurant near that of the defendant had brought the defendant's use of the name and sign into conflict with the plaintiff's interests and thereby had terminated the "arrangement."

BILL IN EQUITY, filed in the Superior Court on June 1, 1949.

The suit was heard by *Murray*, J.

*E. O. Proctor,* (*R. K. Lamere* with him,) for the defendant.

*J. T. Brennan,* (*E. J. Durgin* with him,) for the plaintiff.

QUA, C.J. Each of the parties insists upon its right as against the other to the exclusive use of the trade name "Howard Johnson's" and of a distinctive and well known type of sign of peculiar construction bearing that name, at its roadside restaurant in Falmouth. The two restaurants are less than a quarter of a mile apart. In the Superior Court the trial judge entered a decree permanently enjoining the defendant from the use of the name and sign and dismissing the defendant's counterclaim. The defendant appeals.

There is no doubt that the rights to use the trade name and the distinctive sign were originally the exclusive property of the plaintiff, and that they are valuable rights. The defendant's claim of right to use them rests entirely upon the contentions that in 1938 the plaintiff contracted with one Katherine G. Rust, who then owned and operated the restaurant now owned by the defendant, to allow Mrs. Rust the use of the name and sign for an indefinite period, and that in 1947, when the defendant was organized to take over Mrs. Rust's business, the contract right of Mrs. Rust passed with the other assets to the defendant. In 1949, after reasonable notice to Mrs. Rust, the plaintiff set up its own restaurant and refused to sell its products to the defendant or to permit the defendant to use its name and sign. The judge made certain findings of fact, and the evidence is reported.

The background of the controversy is not substantially disputed and is of considerable significance in passing upon the question whether a contract exists as contended by the defendant. For more than twenty years the plaintiff has been engaged in manufacturing and selling ice cream, candy, food products, and other commodities and in operating or licensing restaurants under the trade name "Howard Johnson's" and has been expanding its business. Some of the restaurants have been operated directly by the plaintiff and others have been operated under so called franchises by

the terms of which the plaintiff allowed the use of its trade name and its sign to holders of the franchises, who were required to buy the plaintiff's products for resale and to conform to the plaintiff's standards in operating their restaurants. In 1938 and for some time prior thereto Mrs. Rust and her husband had been operating a restaurant in Medford under a franchise from the plaintiff. It is to be inferred that Mrs. Rust was familiar with the plaintiff's franchise system and with the plaintiff's standards and the conditions under which franchise holders were allowed to use the "Howard Johnson's" name and sign. In 1938 there was no "Howard Johnson's" restaurant nearer than fifteen or twenty miles to Mrs. Rust's place of business in Falmouth.

The alleged contract rests entirely upon the testimony of Howard D. Johnson, the plaintiff's president and treasurer, and the testimony of Mrs. Rust. Johnson's testimony was this: "She [Mrs. Rust] called me on the phone and told me that she had bought a restaurant . . . in Falmouth . . . , and that she bought it for her mother and father so that they could get the income out of it; and she wanted to know if I would sell her our ice cream and other products. She said, 'I don't want a franchise because it is a summer location and it would cost too much money to run a regular Howard Johnson's.' So I said, 'Well, in view of the job you are doing over in Medford I will be glad to let you sell our products, and I'll go further. I will furnish a sign for you, and as long as I hear you are not hurting us in any way I will be glad to let you use it.'" He further testified that there was talk that she would have to purchase exclusively from the plaintiff "ice cream, frankfurters and our dairy line." Mrs. Rust testified that she thought the talk took place in an automobile. "I think I asked him if I could have the Howard Johnson's, and he said it was a fine idea, and I think that is all we did talk about." "He sent down and affixed the sign because he knew I knew I had to sell the ice cream to use the sign. I was operating as a Johnson." She understood that to have the use of the

sign and good will she would have to buy exclusively from the plaintiff certain products sold by it. Mrs. Rust did not specifically contradict any of the testimony of Johnson as to what was said, although she seems to have felt that her obligation to buy from the plaintiff was implied rather than expressed.

The trial judge found that "the defendant has not acquired the right to use and advertise the trade name 'Howard Johnson's' at its premises in Falmouth in any manner or to use or display the sign bearing the trade name 'Howard Johnson's' which it has in its possession. I also find that the use by the plaintiff of the trade name 'Howard Johnson's' in said Falmouth violates no rights of the defendant." It does not appear whether these conclusions were based upon a finding that no valid contract existed between the plaintiff and Mrs. Rust, and that the "arrangement," as the judge called the relationship, was terminable at will, or upon a ruling that because of the elements of personal experience, skill, and trustworthiness involved in the selection of those who were to be permitted to operate under the Johnson name, the contract, if any, was not assignable and did not pass to the defendant, or upon a finding that, if there was any contract, it was limited in time to a period within which Mrs. Rust's use of the name and sign would not come in conflict with the Johnson interests.

All of the possible grounds of decision suggested above present obstacles of greater or less seriousness for the defendant to surmount. We do not discuss them all because we are of opinion that the ground last mentioned is sound and sufficient in itself. We see no adequate reason for not accepting the testimony of Johnson, not specifically contradicted, that Mrs. Rust in some form of words told him she did not want a franchise because she had a "summer location" and it would cost too much money to run a regular "Howard Johnson's," and that he replied in some form of words that in view of the job she was doing in Medford he would let her sell the Johnson products and would

furnish a sign as long as she was not hurting the plaintiff in any way. Indeed the defendant in its brief accepts the testimony as to not hurting the plaintiff in any way as true and argues in part from it that the "arrangement" constituted a bilateral contract whereby the plaintiff agreed to sell all of its products that Mrs. Rust should require in her business, and she agreed to buy them,[1] and in which the condition as to not hurting the plaintiff in any way furnishes an "objective test"[2] rendering the contract "sufficiently definite as to its duration to be binding."[2] See Williston on Contracts (Rev. ed.) § 1027A. It is enough for the purposes of the present decision that in our opinion the time has come when, if the defendant were allowed the use of the plaintiff's name and sign in the immediate neighborhood of the plaintiff's own restaurant, it would be hurting the plaintiff. Whether the "arrangement" was a valid contract or not, we cannot interpret the condition about not hurting the plaintiff as limited to such harm as might come to the plaintiff in its trade name from improper conduct of Mrs. Rust's restaurant. In our view Johnson was giving a somewhat unusual privilege to Mrs. Rust in not insisting that she become a regular franchise operator, and he intended to make sure that this privilege should never interfere "in any way" with the Johnson interests. Even without this express condition it would be strange if by mere word of mouth in the informal manner here disclosed Johnson intended to grant to Mrs. Rust a continuing right to the Johnson name and sign in such an important tourist center as Falmouth practically in perpetuity, subject only to the requirements that she should buy the Johnson products and conduct her restaurant in a proper manner, and when the condition is taken into account and rightly interpreted in the light of the circumstances, it would be unreasonable for her to suppose that he intended to make such a grant.

[1] See *Gill* v. *Richmond Co-operative Association, Inc.* 309 Mass. 73, 79–80; Williston on Contracts (Rev. ed.) § 104A.

[2] Quotation is from the defendant's brief.

It follows that when the plaintiff started its own restaurant in Falmouth, as it had a right to do, the "arrangement" was at an end.

*Decree affirmed with costs*
*of appeal.*